# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John W. Darrah | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 02 C 4263 | DATE | 10/21/2003 |
| CASE TITLE | Weiler vs. Lapkoff | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
     ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Status hearing held. For the reasons stated in the attached memorandum opinion and order, plaintiffs' motion for summary judgment [16-1] is denied. Enter Memorandum Opinion and Order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 2 number of notices | Document Number |
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | OCT 2 2 2003 date docketed | 26 |
| | Notified counsel by telephone. | | | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | U.S. DISTRICT COURT CLERK FILED 03 OCT 21 PM 4:30 | docketing deputy initials 10/21/03 date mailed notice | |
| | Copy to judge/magistrate judge. | | | |
| MF | courtroom deputy's initials | Date/time received in central Clerk's Office | MF mailing deputy initials | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ANNA L. WEILER, MARTIN PLESH, and )
BARBARA M. STASICA, as Trustees of the )
Diamond Machine Werks, Inc. 401(k) Savings Plan; )
)
Plaintiffs, )
) No. 02 C 4263
v. )
) Judge John W. Darrah
GREGORY J. LAPKOFF, GERHARD H. WEILER, )
and CAROL J. ZOLP, as Trustees of the Weiler )
Engineering, Inc. Employee 401(k) Savings Plan; )
JOHN DOE, Plan Administrator of the Weiler )
Engineering, Inc. Employee 401(k) Savings Plan; )
and THE WEILER ENGINEERING, INC. )
EMPLOYEE 401(K) SAVINGS PLAN; )
)
Defendants. )

DOCKETED
OCT 2 2 2003

## MEMORANDUM OPINION AND ORDER

Plaintiffs, in their capacity as Trustees of the Diamond Machine Werks, Inc. 401(k) Savings Plan" ("Diamond Plan"), filed suit against Defendants for alleged violations of the Employee Retirement Income Security Act of 1974 ("ERISA"). Presently before the Court is Plaintiffs' Motion for Summary Judgment on all three counts of Plaintiffs' Complaint.

## BACKGROUND

The Diamond Plan is an employee pension benefit plan for employees of Diamond Machine Werks, Inc. (Plaint.'s 56.1(a)(3) Statement ¶¶ 6-7). Anna L Weiler is a present trustee of the Diamond Plan. (Id., ¶ 1). Martin Plesh is the Treasurer of Diamond Machine Werks, Inc. and is a present trustee of the Diamond Plan. (Id., ¶ 2). From June 1992 until December 31, 2000, Plesh was employed in various capacities at Weiler Engineering, Inc. Until the end of his employment at Weiler, Plesh was a participant in the Weiler Engineering Inc. Employee 401(k) Savings Plan ("the

Weiler Plan"). (Id., ¶ 3). Plesh was also the Plan and Loan Administrator of the Weiler Plan from May 2000 until December 2000. (Id., ¶ 4). Barbara M. Stasica is also a trustee of the Diamond Plan. (Id., ¶ 5).

Defendants, Gerhard H. Weiler, Carol J. Zolp, and Gregory Lapkoff, became trustees of the Weiler Plan, an employee contribution plan for employees of Weiler Engineering, Inc., effective as of January 1, 2001. The Weiler Plan was acquired as a "package" from Principal Mutual Holding Company. As part of its package, Principal provided Internal Revenue Service-approved plan documents, the forms and notices that are required to be provided to plan participants, and various investment options for plan participants. In addition, Principal maintained all accounting records for the Weiler Plan and, in connection with this service, issues semi-annual statements providing each participant with information concerning the value of his or her separate account at the beginning of the period, the amount(s) of any contributions, distributions, gains, losses, income, expenses, and other data affecting the value of the participant's account during the period in question, and the value of the account as of the date indicated on the statement. (Def.'s 56.1(b)(3) Statement ¶¶ 54-55).

Through December 31, 2000, Weiler Engineering was the corporate parent and sole shareholder of Diamond Machine. (Plaint.'s 56.1(a)(3) Statement ¶ 13). On January 1, 2001, Diamond Machine was split from Weiler Engineering. The spilt-off took place pursuant to a "Split-Off Agreement" dated May 18, 2000, under which shares of Diamond Machine common stock owned by Weiler Engineering were distributed to certain former Weiler Engineering shareholders. (Id., ¶ 14). In connection with the split-off, certain Weiler employees terminated their employment with Weiler effective December 31, 2000, and became employees of Diamond Machine. (Id., ¶ 15).

2

On August 22, 2000, Plesh arranged a meeting with representatives of Principal and the other Plaintiffs to discuss the effect of the Split-Off Agreement on the Weiler Plan and its then-current participants. As a result of the meeting, the Plaintiffs concluded that Diamond Machine would establish its own IRS-qualified defined distribution plan using essentially the same "package" supplied by Principal for the Weiler Plan. (Def.'s 56.1(b)(3) Statement ¶ 57). A corporate resolution dated August 24, 2000, was prepared as a result of the August 22, 2000 meeting. The resolution provided, in relevant part:

> NOW THEREFORE, BE IT RESOLVED, that the sole director hereby authorizes and directs the offices of the Corporation and the directors and officers of Diamond to take such steps as may be necessary to establish the Diamond Machine Werks, Inc. 401(k) Plan, effective as of January 1, 2001, with the Principal Financial Group as the third party administrator, and to implement the transfer of that portion of assets of the Weiler Engineering, Inc. 401(k) Plan representing the account balances of the Diamond Employees to the Diamond Machine Werks, Inc. 401(k) Plan; as of January 1, 2001.

(Id., ¶ 59).

When the former Weiler Engineering employees terminated their employment with Weiler Engineering and became Diamond Machine employees, their account balances under the Weiler Plan were transferred to the Diamond Plan, effective January 1, 2001. Due to the need to take various administrative steps, the actual transfers of assets from the Weiler Plan to the Diamond Plan did not occur for most employees until January 26, 2001. The last employee's funds to be transferred took place on March 28, 2001. Any income realized from December 31, 2000, until the transfer was credited to the participants' account before the balance was transferred to the Diamond Plan. As of March 31, 2001, none of the former Weiler Engineering employees who had become employees of

3

Diamond Machine had any account balances under the Weiler Plan. (Def.'s 56.1(a)(3) Statement ¶ 62).

The total of the account balances in the Weiler Plan of the Diamond Machine employees as of December 31, 2000, was $5,288,505.80. (Plaint.'s 56.1(a)(3) Statement ¶ 22). That amount was transferred from the Weiler Plan to the Diamond Plan after January 1, 2001. On January 1, 2001, the Weiler Plan had a total plan account balance of $13,693,992.50. (Id., ¶ 25).

In July 2001, the Weiler Plan trustees received notice that Principal was planning on demutualizing, *i.e.*, converting from a mutual insurance company to a stock company. (Plaint.'s 56.1(a)(3) ¶ 30; Def.'s 56.1(b)(3) Statement ¶ 66). According to the information supplied by Principal, in order for the demutualization of Principal to be completed, the following had to occur: (1) Principal's board of directors had to make a recommendation to demutualize, which occurred on March 31, 2001; (2) Principal's policyholders had to approve of demutualization, which occurred on July 24, 2001; (3) the Commissioner of insurance had to approve the proposed demutualization, which occurred on August 28, 2001; (4) a registration for an initial public offering of Principal's shares had to be approved by the Securities Exchange Commission, which occurred on October 26, 2001; and (5) there had to be a successful public offering, which occurred on October 26, 2001. (Def.'s 56.1(b)(3) Statement ¶ 67).

Through the demutualization, Principal contract holders who owned Principal group annuity contracts on March 31, 2000, and who maintained ownership through a date in October 2001, received compensation from Principal under the Plan of Conversion of Principal Mutual Holding Company. The Weiler Plan was one of the Principal contract holders that received demutualization compensation. (Plaint.'s 56.1(a)(3) Statement ¶ 31). Under the provisions of the Plan of

Conversion, the "Record Date" of the demutualization was March 31, 2000; and the "Effective Date" of the demutualization occurred in October 2001. (Id., ¶ 32).

Section 7.1(b) of the Plan of Conversion indicates that the consideration received by eligible policyholders in connection with the demutualization included a fixed component of 100 shares of Principal common stock and a variable component defined as the "Aggregate Variable Component". The Aggregate Variable Component was to be allocated in accordance with Section 7.2 of the Plan of Conversion. (Plaint.'s 56.1(a)(3) Statement ¶ 34). Section 7.2 states that each Actuarial Contribution was to be determined on the basis of company records as of the Actuarial Calculation Date without regard to any changes in the status of or premiums in excess of those required on such policies that occur subsequent to the Actuarial Calculation Date. (Id., ¶ 35). The Actuarial Calculation Date was March 31, 2000. (Id., ¶ 37).

As provided in the Plan of Conversion and the Actuarial Contribution Memorandum, at least some of the demutualization compensation received by the Weiler Plan was based on an actuarial calculation based on values determined as of March 31, 2000, which was the "Record Date" of demutualization. (Plaint.'s 56.1(a)(3) Statement ¶ 39). A portion of the value of the Weiler Plan assets held under the Weiler contract on March 31, 2000, represented the accounts of the Diamond Machine employees. (Id., ¶ 41).

The Weiler Plan received a total of $566,007.50 in demutualization compensation from Principal. (Plaint.'s 56.1(a)(3) Statement ¶ 43). The total allocated shares upon which the Weiler Plan's demutualization compensation in the form of policy credits was based on 30,595 shares of Principal stock. (Id., ¶ 46). Principal documentation demonstrates that the fixed component of the demutualization compensation received by the Weiler Plan was based on the allocation of 100 shares

5

of Principal common stock. The variable component was based on the allocation of 30,495 shares of the total of 30,595 shares allocated by Principal to the Weiler Plan. (Id., ¶ 48). The variable component of the demutualization compensation received by the Weiler Plan accounted for approximately 99.67% of the total amount of demutualization compensation received by Weiler. (Id., ¶ 49).

In December 2001, Plesh told Lapkoff that all of the compensation arising from Principal's demutualization had been allocated to the then-current Weiler Plan participants. This was the first time that Lapkoff learned that any compensation had actually been paid as a result of Principal's demutualization. (Def.'s 56.1(b)(3) Statement ¶ 70). Shortly thereafter, Plesh told Lapkoff that he had spoken to unidentified employees at Principal and had been told that it would be possible to reallocate the proceeds of the demutualization among participants of both the Diamond Plan and the Weiler Plan if Lapkoff and the other trustees of the Weiler Plan provided Principal with written instructions to that effect. (Id., ¶ 71). Plesh sent a correspondence to Lapkoff requesting that the Weiler Plan trustees pay to the Diamonf Plan a portion of the demutualization compensation received by the Weiler Plan. (Plaint.'s 56.1(a)(3) Statement ¶ 51).

Lapkoff contacted Principal and inquired about whether the allocations reflected on a statement issued by Principal concerning the demutualization compensation received by the Weiler Plan was correct. Lapkoff was informed that the Diamond Plan was not entitled to receive any portion of the demutualization compensation paid to the Weiler Plan because Diamond Machine was not an eligible participant on the relevant dates. Lapkoff was assured that the manner in which the demutualization compensation had been allocated was in accordance with the law and had been approved by Principal's attorneys. (Def.'s 56.1(b)(3) Statement ¶ 72). Shortly thereafter, Plesh,

Lapkoff, Weiler, and Zolp discussed the manner in which Prinicipal's demutualization compensation had been allocated. Weiler and Zolp concurred in Lapkoff's view that, unless there was some legal authority justifying a transfer of monies from the accounts of current Weiler Plan participants to the accounts of Diamond Plan participants, no portion of the demutualization compensation would be allocated to the former Weiler Engineering employees. (Def.'s 56,1(b)(3) Statement ¶ 73). After this meeting, Lapkoff asked Weiler Engineering's attorneys to research whether the Diamond Plan had any right to share in the demutualization compensation. The attorneys told Lapkoff that no money should be transferred to the Diamond Plan because they could not find any legal authority that justified such a transfer. (Id., ¶ 74).

On March 1, 2002, the trustees of the Diamond Plan requested that the trustees of the Weiler Plan transfer a portion of the demutualization compensation received by the Weiler Plan to the Diamond Plan. (Plaint.'s 56.1(a)(3) Statement ¶ 52). No amount of the demutualization compensation received by the Weiler Plan has been transferred to the Diamond Plan. (Id., ¶ 53).

## ANALYSIS

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). All the evidence and the reasonable inferences that may be drawn from the evidence are viewed in the light most favorable to the nonmovant. *Miller v. American Family Mutual Ins. Co.*, 203 F.3d 997, 1003 (7th Cir. 2000). Summary judgment may be granted when no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

7

Plaintiffs seek summary judgment on Count II of their Complaint, which alleges a violation of Section 208 of ERISA, 29 U.S.C. § 1058.

Section 208 of ERISA regulates the spin-off of ERISA benefit plans. It states, in relevant part:

> A pension plan may not merge or consolidate with, or transfer its assets or liabilities to, any other plan after September 2, 1974, unless each participant in the plan would (if the plan then terminated) receive a benefit immediately after the merger, consolidation, or transfer which is equal to or greater than the benefit he would have been entitled to receive immediately before the merger, consolidation, or transfer (if the plan had then terminated).

29 U.S.C. § 1058.

The regulation governing spin-offs of defined contribution plans parallels the statute. The applicable Treasury Department Regulation states, in pertinent part:

> In the case of a spinoff of a defined contribution plan, the requirements of section 414(1) will be satisfied if after the spinoff—
> (1) The sum of the account balances for each of the participants in the resulting plans equals the account balance of the participant in the plan before the spinoff, and
> (2) The assets in each of the plans immediately after the spinoff equals the sum of the account balances for all participants in that plan.

26 C.F.R. § 1.414(1)-1(m). Accordingly, Section 208 seeks benefit equivalence – a plan spinoff must provide employees at least the same level of benefits "immediately after" the spinoff as they were entitled to "immediately before" the spinoff. *See John Blair Communications, Inc. Profit Sharing Plan v. Telemundo Group, Inc. Profit Sharing Plan*, 26 F.3d 360, 364 (2nd Cir. 1994) (*John Blair*).

8

For example, in *John Blair*, the court found that a plan violated Section 208 when it transferred an amount of funds to a spinoff plan based on a valuation date which was determined four months before the actual transfer date without taking into account the gains occurring during the interim period before the actual transfer. *See John Blair*, 26 F.3d at 364-66. The court found that Section 208 requires that when the plan assets are eventually transferred, the beneficiaries may not lose out on appreciation or depreciation that might have occurred after valuation but before the transfer. *See John Blair*, 26 F.3d at 366.

In the instant case, the valuation date for the spinoff of the Diamond Plan was December 31, 2000, in an amount of $5,288,505.80. The transfer of funds took place over the next three months. The transferred funds included the $5,288,505.80 plus any income credited to the participants' accounts between December 31, 2000 and the actual transfer date. As of the last transfer date, March 28, 2001, the trustees of the Weiler Plan did not have knowledge of the planned demutualization of Principal; and the Weiler Plan had not received any funds from the future demutualization. The compensation for the demutualization of Principal did not become available until October 2001. The Diamond Plan participants were credited for any appreciation in value that occurred between the valuation date of December 31, 2000 and the respective transfer date. Accordingly, the individuals who became Diamond Machine employees and participants of the Diamond Plan received the same level of benefits "immediately after" the spinoff as they were entitled to "immediately before" the spinoff.

Based on the above, Plaintiffs' Motion for Summary Judgment as to Count II is denied.

Plaintiffs also seek summary judgment on Count III of their Compliant, which alleges a violation of Section 406 of ERISA, 29 U.S.C. § 1106.

Section 406(a)(1)(D) provides that "[a] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect ... transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan...." 29 U.S.C. § 1106(a)(1)(D). In addition, "[a] fiduciary with respect to a plan shall not deal with the assets of the plan in his own interest or for his own account." 29 U.S.C. § 1106(b)(1).

Section 406(a)(1) places certain transactions outside the scope of a fiduciary's lawful authority. *See Lockheed Corp. v. Spink*, 517 U.S. 882, 888 (1996) (*Lockheed*). In order to sustain an action for a violation of Section 406(a), "a plaintiff must show that a fiduciary caused the plan to engage in the allegedly unlawful transaction. Unless a plaintiff can make that showing, there can be no violation of § 406(a)(1) to render relief under the enforcement provision." *Lockheed*, 517 U.S. at 888-89.

In the instant case, the alleged unlawful transaction is the failure of the trustees to transfer some of the demutualization compensation from the Weiler Plan to the Diamond Plan. Underlying this theory that the transaction was unlawful is the issue of Diamond Plan's right to receive part of the demutualization compensation. Plaintiffs argue that the Diamond Plan has a right to some of the demutualization compensation because the amount of compensation received was determined, in part, based on the record date of March 31, 2000, at which time some of the Diamond Plan participants were in the Weiler Plan. However, the effective date of the demutualization was October 2001, after the transfer had already taken place. Furthermore, to be eligible for the demutualization compensation, the Principal contract holder had to have owned Principal group annuity contracts on March 31, 2000, and had to have maintained ownership through October 2001. The Diamond Plan did not exist in March 2000.

10

Plaintiffs cite to *John Blair* in support of their conclusion that the Diamond Plan has a right to some of the demutualization compensation. However, as discussed above, the *John Blair* court found that the beneficiaries may not lose out on appreciation or depreciation that might have occurred after valuation but before the transfer. *See John Blair*, 26 F.3d at 366. Here, the demutualization compensation was not realized until several months after the transfer of funds; and the effective date of the demutualization was not until after the transfer. Accordingly, the facts of the instant case are distinguishable from *John Blair*.

Based on the undisputed facts, the Diamond Plan has failed to show that there is no material factual dispute that it is entitled to some part of the demutualization compensation. Accordingly, summary judgment as to Count III is denied.

Plaintiffs also seek summary judgment on their breach of fiduciary claim. Count I of Plaintiff's Complaint alleges that Defendants breached their fiduciary duties to the Diamond Machine employees by failing to transfer a portion of the demutualization compensation to the Diamond Plan. However, as stated above, genuine issues of material fact exist as to whether the Diamond Plan has a claim to some of the demutualization compensation. Accordingly, summary judgment as to Count I is denied.

## CONCLUSION

For the reasons stated above, Plaintiffs' Motion for Summary Judgment is denied.

Dated: October 21, 2003

JOHN W. DARRAH
United States District Judge